Filed 7/15/26  P. v. Landazuri CA2/3

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, Plaintiff and Respondent, v. ADRIAN LANDAZURI, Defendant and Appellant. | B343499 (Los Angeles County Super. Ct. No. 24WCCF00383) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Mike Camacho, Judge.  Reversed.

Monique Hemli-Munoz, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Charles C. Ragland, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Scott A. Taryle and Daniel C. Chang, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted Adrian Landazuri of second degree robbery.  Before Landazuri's trial, the People moved to admit incriminating statements Landazuri made to police officers when they arrived at the scene and questioned Landazuri.  Landazuri objected to the admission of his statements on the ground that the officers obtained them in violation of *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*).  The trial court admitted the statements, finding that Landazuri was not in custody when he made them and therefore *Miranda* advisements were unnecessary.  We hold that the officers' questioning of Landazuri was a custodial interrogation and reverse the judgment.

### FACTUAL AND PROCEDURAL BACKGROUND

In the late morning of April 14, 2024, Gelacio Gallardo was selling flowers on a street corner.  Gallardo's customers paid in cash, which he kept in his pants pocket.  Gallardo saw Landazuri every day sleeping at the nearby bus stop, but they never had any interaction.  Gallardo testified that on that morning Landazuri approached him and asked Gallardo for money in an aggressive and "abusive voice," grabbed Gallardo by his sleeve and took money from Gallardo's pocket.  After taking the money, Landazuri returned to the bus stop.  Gallardo testified that around $80 had been taken.  Gallardo called 911, but gave the operator a false name.

Officer Garcia responded to the 911 call, and on arriving at the scene, detained Landazuri at the bus stop.  Officer Ortega also responded to the scene and spoke to Gallardo and then to Landazuri.  The officers' body-worn cameras recorded their

interaction with Landazuri, and the video was played for the jury. The transcript from the exchange is reproduced here:[1]

> Officer Ortega: Adrian, Adrian, Adrian, man. Uhm, so you took money from the gentleman, okay. All he wants is his money back. If not, he's gonna press charges. So that's why I was trying to get your statement. Now, what is your statement? You're not under arrest right now.
>
> [Landazuri]: He said that?
>
> Officer Ortega: Yeah, standing over there I spoke to him. So I'm asking you, you're not under arrest, okay? I'm asking you what happened, man. And if it's true, all he wants is his money back. Okay? Whatever you're going through, okay? But it's one thing going to jail and *whether or not* you have a chance. So, what do you wanna do? You're not under arrest. Would you like to give me a statement? Or just return the money *and we are good*. What do you wanna do Adrian? Think about it.
>
> [Landazuri]: Where's your, uh, your chief at? Or whatever it's called.
>
> Officer Ortega: I don't need one right now.
>
> [Landazuri]: Well, I'm asking for one.

---

[1] A transcript of the body-worn video was produced at the hearing regarding the exclusion of Landazuri's statement. Upon the court's independent review of the video, we identified several statements that were uttered on the video but not included in the transcription. These statements are denoted in bold italics.

Officer Ortega:  Okay, well you get one after you get arrested.  Is that what you wanna do?  I'm just trying to have a conversation.

[Landazuri]:  I want him right now before I get arrested.  ***That's why you call him***.

Officer Ortega:  No man, you're detained.  Okay?  Right?  So, can I look through your bag?

[Landazuri]:  ***No.***

Officer Ortega:  No?  You don't give me permission to go through your bag?

[Landazuri]:  ***No.***

Officer Ortega:  Okay.  Stand by real quick.

Officer Garcia:  What?

Officer Ortega:  Stand by with him.  Are you saying you want to speak to my supervisor as well?

[Landazuri]:  [inaudible]

Officer Ortega:  Charges?  You got theft on a person.  Possible 211.  So.  I said we have theft on a person.  You went in his pockets.  You had him turn around and you said, "give me your money."  Okay?  You went into his pockets and you took his money.

[Landazuri]:  ***He said that?***

Officer Ortega:  I told you three times already.

[Landazuri]: I'm asking you if that's what he said.

Officer Ortega: Yeah. So what do you wanna do? You don't want to speak on it? Cool.

[Landazuri]: So, should I return his money then or what?

Officer Garcia: Do whatever you want. You have his money?

[Landazuri]: What's he walking away for?

Officer Garcia: What?

[Landazuri]: What's he walking away for?

Officer Garcia: Bro, we don't have all day. Do you have his money yes or no?

[Landazuri]: He just asked him what happened. He said nothing.

Officer Garcia: How much did you take? ***You didn't*** count it? Hey, do you have his money? Where do you have his money, in your right pocket or your left pocket?

[Landazuri]: Left pocket.

Officer Garcia: Your left pocket?

[Landazuri]: I have money in my left pocket.

Officer Garcia: Do you have his money in your left pocket?

[Landazuri]:  I have money in my left pocket.

Officer Garcia:  Alright, go ahead and stand up. Stand up.

Officer Ortega:  Does that money belong to you?

The officers handcuffed Landazuri and walked him to the police vehicle where he was searched.  Officers took money out of Landazuri's pocket, amounting to $56.

Landazuri was tried for second degree robbery (Pen. Code, § 211).  Before trial, the People moved to admit statements Landazuri made to Officers Garcia and Ortega when they arrived at the scene.  The defense objected to admission of the statements on the ground they were obtained in violation of Landazuri's *Miranda* rights.  At the hearing on the motion, the People offered the trial court the opportunity to review the transcript of the body-worn camera.  The court did not review the transcript or the video but relied on counsels' representations of the interaction to determine whether the statements were to be excluded.

The People represented that officers arrived at the scene about 15 minutes after the robbery.  The officers approached Landazuri, who was at a bus stop, and told him he was being detained but was not under arrest.  With respect to the circumstances of the questioning, Landazuri noted that the interaction took place while he was "seated on the bus bench with two officers standing right in front of him [¶] . . . [and that] at one point one of the officers leaves to go down the block to talk to the victim and he tells the other officer, 'stay here with him.'"

In response to the trial court's question as to the nature of the questioning, Landazuri stated that the officers went "directly

to the object of the investigation, the money.  There was really no other discussion other than that."  When the court questioned the People how this would not qualify as a custodial interrogation under those facts, the People responded that the officers "were merely at that time attempting to gather information about what might have occurred.  [¶] . . . I don't know that they ever actually asked, 'Do you have his money,' they say, 'Oh, would you like to give me a statement?  Would you like to just return the money?  What would you like to do?  You can think about it.'  [¶] . . . As for when the one officer does ask, 'Where is his money,' that is only after the defendant has said, 'Should I just turn over the money?'  He goes 'Well, where is it?  Which pocket is it in?'  And that's when the defendant says it's in his left pocket.  It's only at that point in time that I believe the officers have gathered enough evidence to then later arrest the defendant."

The trial court found that the question was "close," but "there was [not] enough to show that he was in custody as opposed to simply being detained for purposes of an investigatory questioning."  The court noted that "[i]t would have been different had the officers . . . [done] some type of felony detention after being advised by the alleged victim that [they were] robbed."  Based on the trial court's understanding of the interaction, it concluded that "[i]t appears to be more of an investigation step to find out more or less what happened as opposed to focusing on the defendant as the actual perpetrator and so I cannot make that step that it's a custodial situation."  The trial court observed that the officers' questions were "designed to elicit incriminating responses" and were not limited to "can you tell us what happened, if he was directly accused of having money purportedly taken from the victim.  So this went beyond a what happened

type of inquiry as opposed to an accusatory type of inquiry.  [¶] But, again, the detention still doesn't turn it into an investigation—a custodial situation.  So I think one tier has been satisfied, but the other has not and for those reasons these statements are admissible without a *Miranda* advisement."

Gallardo testified at trial.  Appellant introduced Officer Ortega's recorded interview with Gallardo in which he stated that Landazuri "actually, . . . didn't even touch me.  All he did [was] he took money from me."  He also admitted to having provided a false name when he called 911.  Officer Ortega also testified, and the People introduced the body-worn camera video of Landazuri's exchange with police and played it multiple times during the trial.

A jury convicted Landazuri of second degree robbery.  On January 17, 2025, the trial court sentenced Landazuri to the low term of two years in prison.

## DISCUSSION

I.      Standard of review

To "give force to the Constitution's [Fifth Amendment] protection against compelled self-incrimination," a custodial interrogation must be preceded by *Miranda* warnings and the suspect's voluntary, knowing, and intelligent waiver of *Miranda* rights.  (*Florida v. Powell* (2010) 559 U.S. 50, 59; *People v. Elizalde* (2015) 61 Cal.4th 523, 530–531.)  Persons in custody thus must be warned that they have the right to remain silent, any statement made may be used as evidence against them, and they have the right to an attorney.  (*Miranda, supra,* 384 U.S. at p. 444.)  For *Miranda* purposes, " 'interrogation' " means "express questioning" or "words or actions on the part of the police (other than those normally attendant to arrest and custody) that the

8

police should know are reasonably likely to elicit an incriminating response from the suspect." (*Rhode Island v. Innis* (1980) 446 U.S. 291, 301, fn. omitted.)

A custodial interrogation occurs when a reasonable person in the defendant's position would feel that their freedom has been deprived in any significant way; for example, a formal arrest or a restraint of movement of the degree associated with formal arrest. (*California v. Beheler* (1983) 463 U.S. 1121, 1125; *People v. Caro* (2019) 7 Cal.5th 463, 491.) When there has been "no formal arrest, the question is how a reasonable person in the defendant's position would have understood [their] situation. [Citation.] All the circumstances of the interrogation are relevant to this inquiry, including the location, length and form of the interrogation, the degree to which the investigation was focused on the defendant, and whether any indicia of arrest were present." (*People v. Moore* (2011) 51 Cal.4th 386, 395.) "Whether a person is in custody 'depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned.' " (*People v. Torres* (2018) 25 Cal.App.5th 162, 172 (*Torres*).)

On appeal, "we accept the trial court's findings of historical fact if supported by substantial evidence but independently determine whether the interrogation was 'custodial.' " (*People v. Aguilera* (1996) 51 Cal.App.4th 1151, 1161 (*Aguilera*).) Where, as here, an interview is recorded, "the facts surrounding the admission are undisputed and subject to our independent review." (*Torres*, *supra*, 25 Cal.App.5th at p. 173.)

If the court determines that the trial court admitted statements obtained in violation of *Miranda*, it then must determine whether such error is harmless beyond a reasonable

doubt, such that the jury would not have reached a different result had the trial court excluded the challenged statements. (*People v. Caro, supra,* 7 Cal.5th at pp. 493, 495 [applying *Chapman v. California* (1967) 386 U.S. 18, 24, standard to *Miranda* violation].)

## II. Analysis

### A. Landazuri was in custody

When the court considers whether an individual was in custody during their questioning, it looks at "the interplay and combined effect of all the circumstances to determine whether on balance they created a coercive atmosphere such that a reasonable person would have experienced a restraint tantamount to an arrest." (*Aguilera, supra,* 51 Cal.App.4th at p. 1162.) The courts have articulated a number of non-exhaustive factors to consider when conducting this analysis. The relevant factors include: (1) "whether contact . . . was initiated by the police or the person interrogated, and if by the police, whether the person voluntarily agreed to an interview"; (2) "whether the express purpose of the interview was to question the person as a witness or a suspect"; (3) location of the interview; (4) whether police informed the person they were under arrest or in custody; (5) whether they informed the person they were free to terminate the interview and leave at any time; (6) "whether there were restrictions on the person's freedom of movement during the interview"; (7) length of the interrogation; (8) "how many police officers participated"; (9) "whether they dominated and controlled the course of the interrogation"; (10) "whether they manifested a belief that the person was culpable and they had evidence to prove it"; (11) "whether the police were aggressive, confrontational, and/or accusatory"; (12) "whether the police used

10

interrogation techniques to pressure the suspect"; and 13) "whether the person was arrested at the end of the interrogation." (*Ibid.*)

After a consideration of these factors, the court concludes that the totality of the circumstances reflect that Landazuri was in custody.

### 1. *Whether law enforcement initiated contact or if person voluntarily agreed to an interview*

The circumstances are less likely to suggest to an individual that they are unable to leave or end the questioning when they voluntarily subject themselves to such an examination. (*People v. Potter* (2021) 66 Cal.App.5th 528, 541 [holding that the defendant was not in custody when he voluntarily came to the police station for an interview]; *People v. Torres, supra,* 25 Cal.App.5th at p. 173 [defendant's agreement to be voluntarily interviewed in unmarked police car weighed against a custodial finding].) In this case, the officers approached Landazuri as he sat on a bus stop bench and informed him that he was detained. They immediately began questioning Landazuri and did not ask if he wanted to speak to them nor did they extend an invitation to speak with him in another location. This was not a voluntary encounter for Landazuri and the initiation by officers, coupled with the other factors present here, weighs in favor of a finding that he was in custody during his questioning.

### 2. *Whether the express purpose was to question the person as a suspect or as a witness*

A custodial interrogation does not occur where an officer detains a suspect for investigation and limits questioning to the

11

purpose of identification or obtaining sufficient information to confirm or dispel the officer's suspicions that a crime has occurred. (*People v. Farnam* (2002) 28 Cal.4th 107, 180; *People v. Clair* (1992) 2 Cal.4th 629, 679–680.)

Officer Ortega's first words to Landazuri were, "[S]o you took money from the gentleman . . . [a]ll he wants is his money back. If not, he's gonna press charges. So that's why I was trying to get your statement. Now, what is your statement." He later specifically told Landazuri that he was suspected of "theft on a person" and asserted that Landazuri "went in [Gallardo's] pockets and . . . took his money." Officer Ortega also conveyed that he had the victim's statement asserting that Landazuri committed the act. These statements demonstrated that the officers' express purpose in questioning Landazuri was as a suspect, not a potential witness.

It is worth noting that the trial court's determination that Landazuri was not in custody was swayed by its understanding, based on the People's representation, that the officers did not begin their questioning with Landazuri as a suspect but were "merely . . . attempting to gather information about what might have occurred." The body-worn camera captured a much different exchange. Given the trial court's recognition that this was a "close" case even without the benefit of the correct record of the officers' statements, it is likely that it would have come to a different conclusion had it considered an accurate picture of Landazuri's interaction with the officers.

3. *Whether the officers manifested a belief that the person was guilty and had evidence to prove it*

The mere fact that an individual is a suspect is not enough to foster a custodial environment; the officers' suspicion must also be communicated to that person for it to factor into the custody determination. (*People v. Vasquez* (1993) 14 Cal.App.4th 1158, 1163—1164 (*Vasquez*); see also *Torres*, *supra*, 25 Cal.App.5th at p. 176 [holding that officers' expressed "belief that [the defendant] was culpable and they had evidence to prove it" weighed in favor of custody determination].) " ' "The awareness of the person being questioned by an officer that . . . the police have ample cause to arrest him, may well lead him to conclude, as a reasonable person, that he is not free to leave, and that he has been significantly deprived of his freedom." ' " (*People v. Saldana* (2018) 19 Cal.App.5th 432, 458 (*Saldana*).)

As already discussed, the officers' belief that Landazuri was a suspect was clearly conveyed through their statements. They even went so far as to identify the Penal Code section they believed that he violated and told him that they had evidence—the victim's statement—supporting that charge. These statements clearly would have made Landazuri aware that he was the subject of the investigation and that the police were not simply questioning him to determine what occurred or as a potential witness.

13

4. *Where the interview took place*

An interview that takes place in public within view of any passersby reduces the ability of an unscrupulous officer to use illegitimate means to elicit incriminating responses and should lessen a suspect's fear of abuse should they not cooperate. (*Berkemer v. McCarty* (1984) 468 U.S. 420, 438.)  Courts have also recognized that traffic stops and other investigatory street detentions are generally understood as temporary and therefore less likely to make individuals feel as though they are not free to leave.  (*Aguilera, supra,* 51 Cal.App.4th at p. 1165 [*Miranda* warnings not required for brief investigatory stops "because the restraint on liberty often occurs in a nonthreatening or noncompulsive public environment and its duration is limited"]; *Vasquez, supra,* 14 Cal.App.4th at pp. 1163–1164 [questioning was not custodial where defendant stopped "on a public street in broad daylight"].)  Despite this presumption, courts have also found that interviews taking place in settings that occur outside of the closed doors of an interrogation room—including on public streets or in an individual's own home—are custodial where the totality of the circumstances indicate that the person was in custody.

Landazuri's interview took place on a public street, as he was seated on a bus stop bench in a structure open in the front but enclosed on the sides, back and top.  While the public nature of the interaction lessened the likelihood that inappropriate investigative tactics would be used by the officers, the fact that it took place in a partially enclosed structure and that the officers' physical positions prevented him from exiting the situation undermines the presumption that on the street interactions are inherently transitory and noncustodial.

> 5. *Whether law enforcement informed the person that they were under arrest or in custody*

Officer Ortega told Landazuri that he was "not under arrest right now," but did state that he was being "detained." It has " 'never been the law that a police officer can insulate an otherwise clearly custodial interrogation from *Miranda*'s reach simply by telling a suspect that he or she is "not under arrest." ' " (*Torres*, *supra*, 25 Cal.App.5th at p. 174, citing *Smith v. Clark* (9th Cir. 2015) 804 F.3d 983, 988.) Rather, we " 'must consider the delivery of these statements within the context of the scene as a whole.' " (*Saldana*, *supra*, 19 Cal.App.5th 432, 457 (quoting *United States v. Craighead* (9th Cir. 2008) 539 F.3d 1073, 1088.) In this instance, Landazuri was detained after having been approached by two officers who initiated the questioning and clearly conveyed that he was suspected of a crime. Additionally, Officer Ortega also directed Officer Garcia to remain with Landazuri when he walked away to speak with Gallardo, further suggesting in both words and actions to Landazuri that he was in the custody of the police and not free to end the interaction, notwithstanding the absence of a clear statement that he was under arrest.

> 6. *Whether the officers informed the person that they were free to terminate interview and leave at any time*

The officers never conveyed to Landazuri that he was free to leave. Similar to the advisement that an individual is not under arrest, " '[t]he mere recitation of the statement that the subject is free to leave or terminate the interview . . . does not render an interrogation non-custodial per se.' " (*Saldana, supra,*

15

19 Cal.App.5th at p. 457 (quoting *United States v. Craighead, supra*, 539 F.3d at p. 1088.) However, in this case, Landazuri did not receive that notice. (See *Aguilera, supra*, 51 Cal.App.4th at p. 1164 [noting officers' failure to advise the defendant that they were free to leave weighed in favor of custodial finding].)

       7.    *Whether there were restrictions on the person's freedom of movement*

Whether an individual's movements have been restrained obviously heavily influences the assessment whether the individual reasonably believes they are free to leave. While a formal arrest is not necessary for a custodial finding, the type of restrictions relevant here are those that impose physical limitations on an individual's freedom. (*Moore, supra*, 51 Cal.4th at p. 395 ["Custody consists of a formal arrest or a restraint on freedom of movement of the degree associated with a formal arrest"].) The loss of freedom thus refers specifically to freedom of "physical movement," not the effects of other coercive factors on an individual's will. (*TRW, Inc. v. Superior Court* (1994) 25 Cal.App.4th 1834, 1850 [recognizing "freedom of action refers to freedom of physical movement," and rejecting argument that "intimidating circumstances" for reasons such as potential job loss or general interview pressures can trigger a custodial finding].)

While Landazuri was not handcuffed, he was approached while sitting on a bus bench by two officers who stood close to him and whose positions prevented Landazuri from exiting the interaction. It is unlikely that a reasonable person would have felt that they were free to stand and walk through the interviewing officers in order to exit the scene. Officer Ortega's direction to Officer Garcia to remain with Landazuri while

16

Officer Ortega stepped away further underscores that the officers' physical presence was used to convey to Landazuri that he was not free to leave.

### 8. *How long the interrogation lasted*

The length of an interrogation is relevant to the custody analysis because, in general, longer interrogations more strongly convey that one is not at liberty to terminate the questioning until they provide their interrogators with the desired response. (*Berkemer v. McCarty, supra*, 468 U.S. at p. 437.) "The longer the period of questioning, the more likely it will be found to be coercive and custodial, although even one question may be enough in the proper circumstances." (*People v. Herdan* (1974) 42 Cal.App.3d 300, 307, fn. 12 (*Herdan*).)

The relatively short duration of Landazuri's interaction with the officers—around six minutes—was not on its own long enough to cause a reasonable person to infer that they were not free to leave. However, "case law provides no bright-line rules regarding how long an interrogation must proceed before its duration is more consistent with custody than not." (*Saldana, supra*, 19 Cal.App.5th at p. 463 [interrogation for less than an hour held custodial]; see also *In re Anthony L.* (2019) 43 Cal.App.5th 438, 446–447 [20-minute interview held custodial]; *People v. Davidson* (2013) 221 Cal.App.4th 966, 972–973 [two-minute detention held not custodial]; *Moore, supra*, 51 Cal.4th at pp. 402–403 [one hour 45 minute long interview at police station held not custodial]; *Vasquez, supra*, 14 Cal.App.4th at p. 1164 [brief stop with single question not custodial]; *Sims, supra*, 109 Cal.App.3d at pp. 904–905 [brief stop with two questions held custodial].) In an "otherwise close case where duration might serve as a tipping point, [however] the more significant factor is

17

the nature of the questioning, the character and quality of the interaction between law enforcement and the person being interrogated." (*Saldana*, at p. 463.) In a case that did not have as many other objective indicia of custody, the relatively brief period of questioning might have tipped the scales against finding that a reasonable person would have believed they were not free to leave. However, in the absence of any bright line rule precluding a custody finding for questioning of this length, this factor does not outweigh the factors that support a custody finding.

9. *How many officers participated*

The number of officers involved in the questioning of a defendant is relevant because, "[l]ogically, the fewer the number of officers surrounding a suspect the less likely the suspect will be affected by custodial pressures." (*People v. Bejasa* (2012) 205 Cal.App.4th 26, 36.) The ratio of officers to suspects may therefore impact whether a reasonable person would feel free to terminate an interaction with the police. (*People v. Pilster* (2006) 138 Cal.App.4th 1395, 1403.) Landazuri was confronted by two officers. This two-to-one ratio has repeatedly been found by courts to weigh in favor of a custodial finding, with a one-to-one ratio weighing in the opposite direction. (Compare *Torres*, *supra*, 25 Cal.App.5th at p. 176 [interview with two officers deemed custodial] with *Saldana*, *supra*, 19 Cal.App.5th at p. 459 [recognizing that questioning by only one officer weighed against a custody finding]; *Vasquez*, *supra*, 14 Cal.App.4th at p. 1163 [same].) The trial court also acknowledged that the two officers approaching Landazuri "appears to be somewhat of a show of force." We agree. The two-to-one ratio here, while not sufficient

18

on its own, was more apt to convey that Landazuri was in custody than that he was free to leave.

          10.    *Whether the police dominated and controlled the interrogation*

*Miranda* concerned itself with combating the " 'psychological pressures "which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely," ' which are created by . . . [a] ' "police-dominated atmosphere." ' " (*Saldana, supra*, 19 Cal.App.5th at pp. 454–455.)  Courts have found that police dominated in cases, for instance, where they repeatedly rejected the suspect's claims of innocence or suggested that the questioning would continue until the suspect admits or explains their guilt.  (*Id.* at pp. 459–460; *People v. NavaAdame* (2025) 116 Cal.App.5th 1, 21 (*NavaAdame*).)

      The record does not reflect that the officers dominated their encounter to the same degree as in *Saldana* or *Aguilera* where the officers dismissed repeated denials; however, the totality of the interaction—from the officers' physical confrontation of Landazuri to their accusatory questioning—demonstrates that the situation was controlled by the police, not Landazuri.  Further, during the exchange, Landazuri asks to speak with a "chief," and this request is denied by Officer Ortega who says "I don't need one right now."  The People argue that Landazuri's requests for the officers' "chief" demonstrates that Landazuri was not intimidated by the officers.  However, this request is one of the first statements made by Landazuri, and it is rejected by Officer Ortega whose answer indicates that whether a supervising officer will be called is dependent on Officer Ortega's assessment of the need for such an officer, not at the request of

19

Landazuri. This exchange is more reasonably interpreted as an expression by the officers that they are controlling the scene and requests by the suspect will not be accommodated than as evidence of Landazuri's perceived freedom of movement.

11. *Whether the police were aggressive, confrontational and/or accusatory*

"[O]n the issue of custody, courts consider highly significant whether the questioning was brief, polite, and courteous or lengthy, aggressive, confrontational, threatening, intimidating, and accusatory." (*Aguilera*, *supra*, 51 Cal.App.4th at p. 1164.) They recognize that " '[a]ccusatory questioning is more likely to communicate to a reasonable person in the position of the suspect, that he is not free to leave' than would general and neutral investigatory questions." (*Ibid.*; *People v. Farnam*, *supra*, 28 Cal.4th at p. 180.)

As already discussed, the officers first approached Landazuri by asserting that he had taken Gallardo's money. Their questioning was consistent with the position that the officers believed him to be guilty of theft: "[Y]ou took money from the gentleman . . . . So that's why I was trying to get your statement. Now, what is your statement?" "You went into his pockets and you took his money . . . . So, what do you wanna do? You don't want to speak on it?" "Where do you have his money, in your right pocket or your left pocket?" It was solely focused on the crime and clearly accusatory toward Landazuri, not merely geared to identifying who Landazuri was or discerning whether there was a competing version of events that would negate a crime in the first instance. (See, e.g., *Sims*, *supra*, 109 Cal.App.3d at p. 905 [asking suspect twice where the contraband was located "was highly accusatory"]; compare *Herdan*, *supra*, 42

20

Cal.App.3d at p. 308 [being approached and questioned by two officers and being asked one question that was "clearly intended to elicit an incriminating admission [¶] . . . indicate[d] that appellant was in custody at the time of arrest [and] that he was not free to leave"]; with *NavaAdame*, *supra*, 116 Cal.App.5th at p. 18 [reasonable person would have felt free to terminate an interview where the officer "spent much of the time listening to [defendant] freely narrate matters . . . [citation] . . . [while the officer] maintained an inquisitive and nonaggressive tone"].)

While the officers in this case were respectful and not aggressive, "a pleasant and conversational tone of voice does not negate the inherently coercive nature of this interrogation in the absence of *Miranda* warnings." (*Saldana*, *supra*, 19 Cal.App.5th at p. 460.) The accusatory nature of the questioning therefore renders it less likely that Landazuri would have felt free to end the questioning.

12. *Whether the police used interrogation techniques to pressure the person*

The mere utilization of interrogation techniques is not evidence of improper police conduct, but when employed during a custodial interrogation in the absence of a *Miranda* warning, there is concern that any statements so procured may be involuntary at best and false at worst. (*Saldana*, *supra*, 19 Cal.App.5th at p. 460 ["These tactics are not unusual, nor are they unreasonable. In fact, if Saldana had been properly *Mirandized* and made the same confession, it might be called good police work"]; *In re Elias V.* (2015) 237 Cal.App.4th 568 (*Elias V.*) ["The foundational theses of *Miranda* are that 'the modern practice of in-custody interrogation is psychologically rather than physically oriented' . . . and the psychological

21

techniques now employed by interrogators 'trade[ ] on the weakness of individuals,' and 'may even give rise to a false confession' " (citation omitted)].)

While the relatively brief length of the encounter necessarily limited the officers' ability to employ any interrogation techniques, Landazuri argues that the officers used the technique known as " 'maximization/minimization' . . . designed to convey two things.  The first is 'the interrogator's rock-solid belief that the suspect is guilty' . . . [and the second] 'communicates by implication that leniency in punishment is forthcoming upon confession.' " (*Elias V., supra*, 237 Cal.App.4th at p. 583.)  He asserts this is evident from the officers' first approach when they assert unequivocally that he took Gallardo's money and then tell him his options are to give a statement or "return the money and we are good."  While this iteration of the technique was not as extreme as those recounted in other cases, it is present nonetheless.  The officers' framing of Landazuri's choices is strategically designed to ensure that he believes his options are limited and to encourage him to respond in an inculpatory manner.  This therefore weighs in favor of a finding that Landazuri was subject to a custodial interrogation.

13. *Whether the person was arrested at the end of the questioning*

When an officer arrests an individual at the end of the interaction this may be additional evidence that an individual correctly perceived that they were not free to leave, and weighs in favor of finding that the stop was custodial.  (*Saldana, supra*, 19 Cal.App.5th at p. 461 [custody finding where defendant arrested a few minutes after inculpatory statements]; *People v. Potter, supra*, 66 Cal.App.5th at pp. 542, 539 [no custody finding where

22

defendant arrested three days after police interview].)  That Landazuri was arrested at the end of his questioning is therefore another factor weighing in favor of finding that the stop was custodial.

### B.      Landazuri was interrogated

The protections provided by *Miranda* apply only to custodial interrogations.  " '[T]he term "interrogation" under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police . . . that the police should know are reasonably likely to elicit an incriminating response from the suspect."  (*People v. Zapata* (2026) 118 Cal.App.5th 529, 538 (quoting *Rhode Island v. Innis*, *supra*, 446 U.S. at p. 301).)  Volunteered statements, for instance, that were not made in response to police questioning are not the product of an interrogation and thus not inadmissible under *Miranda* even when the statements were made while in custody.  (*People v. Mickey* (1991) 54 Cal.3d 612, 648.)  Where a defendant seeks to exclude statements made in the absence of a *Miranda* advisement, they must therefore establish both that the police questioning was an interrogation and that it occurred while the individual was in custody.

The trial court found based on its understanding of the conversation that Landazuri's interaction with the officers was an interrogation.  We agree, and this is even more apparent upon review of the complete exchange.  The officers expressly ask Landazuri questions that required an incriminating response, such as Officer Garcia's inquiry, "Where do you have his money, in your right pocket or your left pocket?"  Landazuri's statements were not volunteered and were directly responsive to the officers' inquiries.  The officers' questioning constituted an interrogation.

23

C. The admission of Landazuri's statements was prejudicial

After concluding that Landazuri's non-*Mirandized* statement was inadmissible, the court must now determine whether its admission was harmless error and did not impact the jury's guilty verdict. "That is, we assess ' "whether it appears 'beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.' " "To say that an error did not contribute to the verdict is . . . to find that error unimportant in relation to everything else the jury considered on the issue in question." ' " (*NavaAdame*, *supra*, 116 Cal.App.5th at pp. 21–22, citations omitted.) On the trial record, we must conclude that the inclusion of Landazuri's testimony was prejudicial.

"A confession is like no other evidence. Indeed, 'the defendant's own confession is probably the most probative and damaging evidence that can be admitted against him.' " (*Arizona v. Fulminante* (1991) 499 U.S. 279, 296.) In this case, Gallardo's testimony was the only evidence against Landazuri other than Landazuri's statement. The People expressly relied on Landazuri's statements to establish that a theft occurred. They played the video of Landazuri's statements multiple times during trial and cited Landazuri's statement, "left pocket," as an admission of the theft. They also cited Landazuri's question, "Is that what he said?" in response to Officer Ortega's statement that Gallardo said Landazuri had gone "into his pockets and . . . took his money," as an adoptive admission. The People clearly relied heavily on Landazuri's statement, and we cannot say that in the absence of this statement the jury would have come to the same conclusion. (Compare with *People v. Pilster*, *supra*, 138 Cal.App.4th at pp. 1406–1407 [finding no prejudice from

admission of defendant's statement where the prosecution never argued that the jury should consider defendant's statement and additional evidence including third-party eyewitness testimony was introduced].)

The People did introduce photos of the $56 found on Landazuri and expressly argued that this amount was "around the same" as what Gallardo testified had been taken. However, possession of money—particularly money in an amount that differed from what the victim claimed had been stolen—is not on its own evidence of any crime. Without evidence or argument supporting the inference that this theft was the only likely source of the money, Landazuri's possession of $56 is not such persuasive evidence of any crime that it would render admission of his statement harmless error.

Both parties acknowledge that Landazuri's primary argument at trial was that the People had not established that Landazuri took the money through force or fear. Landazuri's statements, as reflected in the video, did not include any direct admissions regarding the use of force or fear. Indeed, even his statements that could be interpreted as an admission of theft were relatively ambiguous. Nonetheless, Landazuri's own statements that can be construed as an admission of theft likely bolstered the jury's assessment of Gallardo's testimony, particularly where there appeared to be inconsistencies. (See, e.g., *Arizona v. Fulminante, supra,* 499 U.S. at p. 298 [holding that admission of confession was not harmless where the "jury's assessment of the confession to [the witness] could easily have depended in large part on the presence of the [illegal confession]. Absent the admission . . . the jurors might have found [the witness's] story unbelievable"].) Moreover, in the absence of

25

Landazuri's inculpatory statements, he could have made a completely different argument at trial that did not solely focus on the element of force or fear.  We therefore cannot find that the admission of Landazuri's statements was harmless error. (*Torres*, *supra*, 25 Cal.App.5th at p. 181 [finding prejudice where there were no witnesses or physical evidence and defendant's non-*Mirandized* statements was primary evidence].)  Accordingly, we must reverse.

## DISPOSITION

The judgment is reversed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

OCHOA, J.*

We concur:

EGERTON, Acting P. J.

ADAMS, J.

---

\*      Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.